No. 22-12071

In the

# United States Court of Appeals
## for the Eleventh Circuit

---

CAYLEE NOGGLE, in her official capacity as Commissioner of
the Georgia Department of Community Health,
*Appellant,*

v.

MH a minor child, by his legal guardian, THELMA LYNAH; CC, a
minor child, by her guardian CHRISTINE CLAXTON; and EC, a
minor child, by her legal guardian, KETIE CALIXTE,
*Appellee.*

---

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:15-CV-1427-TWT — Thomas W. Thrash, Jr., *Senior Judge*

---

## BRIEF OF APPELLANT

---

Jason S. Naunas
  *Senior Assistant Attorney General*
Michelle W. LeGrande
  *Senior Assistant Attorney General*
Mark J. Cicero
  *Senior Assistant Attorney General*

Christopher M. Carr
  *Attorney General*
Bryan K. Webb
  *Deputy Attorney General*
Shalen S. Nelson
  *Senior Assistant Attorney General*
Office of the Georgia Attorney
General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3416
jnaunas@law.ga.gov

Counsel for Appellant

Noggle v. MH, No. 22-12071

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Alliant Health Solutions f/k/a Georgia Medical Care Foundation, Party of Interest;

Berry, Frank, (former) Commissioner, Georgia Department of Community Health;

Calixte, Ketie, representing E.C.;

Carr, Christopher M., Attorney General, Counsel for Defendant/Appellant;

C.C., a minor child, Plaintiff/Appellee;

Cicero, Mark J., Senior Assistant Attorney General, Counsel for Defendant/Appellant;

Class members;

Claxton, Christine, representing C.C.;

Deegan, Kamryn, Counsel for Plaintiffs/Appellee;

E.C., a minor child, Plaintiff/Appellee;

Fleming, John, Counsel for Plaintiffs/Appellee;

Georgia Department of Community Health;

Halsey, Anna, Counsel for Plaintiffs/Appellee;

LeGrande, Michelle W., Senior Assistant Attorney General, Counsel for Defendant/Appellant;

Lynah, Thelma, Mother representing M.H.;

M.H., a minor child, Plaintiff/Appellee;

Murphy, Cameron, Counsel for Plaintiffs/Appellee;

Noggle v. MH, No. 22-12071

Naunas, Jason, Senior Assistant Attorney General, Counsel for Defendant/Appellant;

Nelson, Shalen S., Senior Assistant Attorney General, Counsel for Defendant/Appellant;

Noggle, Caylee, Commissioner, Georgia Department of Community Health;

Norris, Joshua, Counsel for Plaintiffs/Appellee;

Raykin, Alla, Counsel for Plaintiffs/Appellee;

Reese III, Clyde, (former) Commissioner, Georgia Department of Community Health;

Regna, Charles, Father, representing S.R;

S.R., a minor child, Plaintiff/Appellee;

Thrash Jr., Thomas W., United States District Judge;

Webb, Bryan, Deputy Attorney General, Counsel for Defendant/Appellant;

/s/ *Jason S. Naunas*
Jason Naunas

# STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument in this case. This case has stretched on for several years. There are dozens of orders on appeal. And the trial court erred at every stage. It repeatedly granted individual preliminary injunctions, based on differing facts, and yet certified a class anyway. At summary judgment, it seemed to hold that the Department must defer blindly to the treating physician's recommendation on the amount of skilled nursing hours that class members need. And then it granted individual permanent injunctions for each for each class member in reliance on those legal errors. All of those holdings conflict with well-established precedent. Given the magnitude of the district court's legal errors and the case's procedural complexity, oral argument would assist this Court.

## TABLE OF CONTENTS

**Page**

Jurisdiction ................................................................................. ix

Statement of Issues ....................................................................... 1

Introduction ................................................................................. 2

Statement of the Case .................................................................... 6

    A.  Early Periodic Screening Diagnostic and Treatment
        Under Georgia's Medicaid Program ................................... 7

        1. Statutory Background ...................................................... 7

        2. Utilization Review ......................................................... 10

        3. Alliant's Review Team ................................................... 12

    B.  Certain Purported Class Members Challenge EPSDT
        Decisions ........................................................................ 13

        1. MH .............................................................................. 14

        2. CC .............................................................................. 17

        3. EC .............................................................................. 18

        4. KM ............................................................................. 19

        5. RV .............................................................................. 19

        6. BP .............................................................................. 21

        7. NH .............................................................................. 22

# TABLE OF CONTENTS
## (continued)

Page

      8. EP .................................................................22

   C. Proceedings Below .........................................23

   D. Standard of Review .......................................28

Summary of Argument...............................................28

Argument ...................................................................30

   I. Appellees did not meet the requirements for class
     certification. ..................................................30

     A. Appellees failed to show commonality. ......31

     B. Appellees failed to show typicality............35

     C. Appellees failed to satisfy Federal Rule of Civil
       Procedure 23(b)(2).....................................37

   II. Preliminary Injunctions must fall. ...............40

     A. The trial court repeatedly granted TROs and
       preliminary injunctions simultaneously. ...................40

     B. The trial court applied the wrong standard...............42

   III. Appellees failed to satisfy the requirements for
     summary judgment.........................................43

     A. The Department considered the treating physician's
       request.........................................................44

## TABLE OF CONTENTS
### (continued)

Page

B. Alliant did not wean people off of GAPP....................48

C. The Department need not consider whether additional nursing hours would be convenient for caregivers. ....51

D. There is an administrative process for skilled nursing disputes. ....................................................................53

IV. Permanent Injunctions must fall. ...................................56

A. Permanent Injunction relies on erroneous summary judgment and class certification................................56

B. Trial court improperly granted individualized permanent injunctions to class members..................58

Conclusion .................................................................................59

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alabama v. United States Army Corps of Eng'rs,*
424 F.3d 1117 (11th Cir. 2005) ................................................... 56

*All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,*
887 F.2d 1535 (11th Cir. 1989) ............................................. 40, 41

*Associated Builders & Contractors Fla. E. Coast Chptr v. Miami-Dade Cty.,*
594 F.3d 1321 (11th Cir. 2010) ................................................. 40

*Corbett v. Transp. Sec. Admin.,*
930 F.3d 1225 (11th Cir. 2019) ................................................. 36

*Craft v. Memphis Light, Gas & Water Div.,*
534 F.2d 684 (6th Cir. 1976) ..................................................... 39

*Cromwell v. Kobach,*
199 F. Supp. 3d 1292 (D. Kan. 2016) ....................................... 38

*Galvan v. Levine,*
490 F.2d 1255 (2d Cir. 1973) .................................................... 39

*Hillis v. Equifax Consumer Servs.,*
237 F.R.D. 491 (N.D. Ga. 2006) ............................................... 37

*Hunter v. Medows,*
Civil Action No. 1:08-CV-2930 ................................................. 23

*J-B Weld Co. v. Gorilla Glue Co.,*
978 F.3d 778 (11th Cir. 2020) ................................................... 57

*Kansas Health Care Ass'n v. Kan. Dep't of Soc. &*
   *Rehab. Servs.,*
   31 F.3d 1536 (10th Cir. 1994) .................................................. 39

*Karhu v. Vital Pharms., Inc.,*
   621 Fed. Appx. 945 (11th Cir. 2015) ........................................ 37

*Klay v. United Healthgroup, Inc.,*
   376 F.3d 1092 (11th Cir. 2004) ................................................ 28

*Lebron v. Sec'y of the Fla. Dep't of Children &*
   *Families,*
   772 F.3d 1352 (11th Cir. 2014) ................................................ 57

*London v. Wal-Mart Stores, Inc.,*
   340 F.3d 1246 (11th. Cir. 2003) .............................................. 28

*M.R. v. Bd. of Sch. Comm'rs,*
   286 F.R.D. 510 (S.D. Ala. 2012) .............................................. 38

*Manor Healthcare Corp. v. Lomelo,*
   929 F.2d 633 (11th Cir. 1991) .................................................. 43

*Moore v. Reese,*
   637 F.3d 1220 (11th Cir. 2011) ........................................ *passim*

*Nat'l Parks Conservation Ass'n v. Norton,*
   324 F.3d 1229 (11th Cir. 2003) ................................................ 28

*Prado-Steiman v. Bush,*
   221 F.3d 1266 (11th Cir. 2000) ................................................ 35

*S.D. v. Hood,*
   391 F.3d 581 (5th Cir. 2004) ...................................................... 8

*Sandford v. R. L. Coleman Realty Co.,*
   573 F.2d 173 (4th Cir. 1978) .................................................... 39

*Siegel v. Lepore,*
   234 F.3d 1163 (11th Cir. 2000) ................................................ 42

*Sprague v. GMC,*
   133 F.3d 388 (6th Cir. 1998) ....................................................... 35

*United Farmworkers of Fla. Hous. Project, Inc. v.*
   *Delray Beach,*
   493 F.2d 799 (5th Cir. 1974) ....................................................... 38

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981) ....................................................................... 57

*P.V. ex rel. Valentin v. School District of Philadelphia,*
   289 F.R.D. 227 (E.D. Pa. 2013) ................................................. 34

*Valley Drug Co. v. Geneva Pharms., Inc.,*
   350 F.3d 1181 (11th Cir. 2003) ........................................... 31, 38

*Vega v. T-Mobile USA, Inc.,*
   564 F.3d 1256 (11th Cir. 2009) ................................................. 38

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ....................................................................... 31

**Statutes**

28 U.S.C. § 1291 ...................................................................................ix

28 U.S.C. § 1331 ...................................................................................ix

42 U.S.C. § 431.10(e)(1)(ii) .................................................................. 7

42 U.S.C. § 1396(a)(4)(B) .................................................................... 53

42 U.S.C. § 1396a(30) ................................................................... 10, 54

42 U.S.C. § 1396a(a)(3) ....................................................................... 53

42 U.S.C. § 1396d(r) ............................................................................. 7

42 U.S.C. § 1396d(r)(5) ....................................................................... 52

42 U.S.C. § 1983 ...................................................................................ix

Medicaid Act, 42 U.S.C. § 1396 *et seq.* .............................................. ix

O.C.G.A. § 49-4-140 ............................................................... 7

O.C.G.A. § 49-4-153(e)(2) ....................................................... 54

**Other Authorities**

42 C.F.R. 431.220(a) ............................................................. 48

42 C.F.R. § 431.10 ................................................................. 7

42 C.F.R. §§ 431.205, 431.220(a) ......................................... 53

42 C.F.R. §§ 431.205, 456 ..................................................... 10

42 C.F.R. § 440.80 ................................................................. 53

42 C.F.R. § 456.1 ................................................................... 54

42 C.F.R. § 456.1(b)(7) .......................................................... 55

42 C.F.R. § 456.2(b)(2) .......................................................... 55

42 C.F.R. § 456.3 ................................................................... 55

42 C.F.R. § 456.5 ................................................................... 55

Fed. R. App. P. 32(a)(7)(B) .................................................... 60

Fed. R. Civ. P. 23(a) .................................................. 30, 31, 37

Fed. R. Civ. P. 23(b) ............................................................. 31

Fed. R. Civ. P. 23(b)(2) ........................................ 31, 37, 38, 39, 58

Fed. R. Civ. P. 56(c) .............................................................. 43

Fed. R. Evid. 702 ................................................................... 16

OSAH Rule 616-1-2-.27 ......................................................... 54

# JURISDICTION

The trial court has subject-matter jurisdiction under 28 U.S.C. § 1331. Appellees brought a civil action under 42 U.S.C. § 1983 for alleged violations of the Medicaid Act, 42 U.S.C. § 1396 *et seq*.

This court has appellate jurisdiction under 28 U.S.C. § 1291. The trial court granted permanent injunctive relief creating a final decision for appeal.

This appeal is timely because the trial court granted permanent injunctions on May 12, 2022. The notice of appeal was filed within thirty days on June 10, 2022.

## STATEMENT OF ISSUES

1.  Did the trial court erroneously certify a class when each claim required individualized review?

2.  Did the trial court erroneously grant individual preliminary injunctions to purported class members when it expedited the hearings and placed the burden of proof on the Department?

3.  Did the trial court erroneously grant summary judgment to Appellees by ignoring binding precedent which holds the Department may disagree with the treating physician and adjust the number of hours as medical necessity changes?

4.  Did the trial court erroneously grant individual permanent injunctions to purported class members and require the Department to prove why an injunction should not be entered?

# INTRODUCTION

As required by the Medicaid Act, Georgia approves skilled nursing services for medically fragile children under the age of 20 years and 11 months. These nursing services are intended for the skilled needs of members based upon medical necessity. Accordingly, the Georgia Department of Community Health (the "Department") contracts with an independent medical utilization reviewer, Alliant Health Solutions ("Alliant"), to approve services and determine the medically necessary skilled nursing hours.

Contrary to this Court's precedent, the plaintiffs below assert that only the opinion of the child's doctors should be given any credence, and therefore brought suit against Georgia's Medicaid program alleging that they were not receiving the number of skilled nursing they require because Alliant opined a lower number of hours were suitable. Ultimately, the trial court certified a class for three claims relating to: (1) whether Alliant considered the treating physician's recommendation; (2) whether skilled nursing needs are shifted to caregivers in order to remove members from the program; and (3) whether Alliant is to consider the caregiver's capacity. [Dkt. 80 at 5].

Along with class certification, the trial court granted a series of injunctions requiring the Department to approve a specific

2

number of skilled nursing hours for specific class members. *See* [Dkt.13 at 16; 141 at 4-5; 166 at 6-7; 216 at 7; 219 at 7; 233 at 7; 304 at 6; 348 at 6; 411 at 7; 420 at 6; 427 at 7; 428 at 6]. The trial court then granted summary judgment where it made disputed factual findings that certain policies exist and misapplied existing law to find the Department did not give appropriate weight to the treating physician's recommendation; erroneously found the Department shifted medically necessary skilled nursing hours unto caregivers; and found that caregiver capacity is moot but continued to rule that the Department would have to consider caregiver capacity despite having ruled that skilled nursing hours are only for Medicaid members. Relying upon its earlier erroneous earlier orders, it granted permanent injunctions for some members of the purported class.

The trial court erred at each step. First and foremost, the entire history of this action shows that individualized facts predominate over class claims. There are three different named plaintiffs, three different sets of medical conditions, and conflicting medical opinions as to each of them. Thus, class certification was inappropriate.

Second, the trial court improperly granted preliminary injunctions. It applied the incorrect burden and expedited almost

every proceeding. The trial court never held a separate hearing on any of the requests for preliminary injunction. And it ignored this Court's decision in *Moore v. Reese,* 637 F.3d 1220, 1257-58 (11th Cir. 2011) ("*Moore*"), which holds the Department is only to approve skilled nursing hours "sufficient in amount to reasonably achieve the purposes of private duty nursing services."

Third, the trial court erred when it granted summary judgment. It made factual findings that are not supported by the record or in the alternative, are contested, in order to find that the three policies exist. It then erroneously determined the Department did not give sufficient weight to the treating physician's recommendation. It is clear the Department considers the treating physician recommendation, which is what is required by *Moore*. Alliant "evaluated [the treating physician's] orders and the training needs of caregivers to arrive at its nursing hours decisions. This is consistent with federal regulations, the federal CMS Manual, and our precedent." *Moore*, 637 at 1257 (citations omitted).

While the trial court never explicitly states the weight it gives the treating physician's recommendation, in practice it viewed the recommendation as dispositive. "In each case, the [trial c]ourt granted injunctive relief to require [the Department] to provide

4

the skilled hours recommended by the treating physician, instead of the lower hours approved by" the Department. [Dkt. 386 at 8]. This conflicts both with *Moore* and Centers for Medicare and Medicaid Services' ("CMS") guidance.

As for the claim that the Department shifts skilled duties to caregivers in order to remove members from Georgia Pediatric Program ("GAPP"), there is no evidence supporting such a claim. Later, Appellees apparently changed their claim to argue that medically necessary hours are shifted to caregivers. The trial court agreed based on two things: (1) hours are reduced when the participants are stable and (2) hours are sometimes reduced. But neither fact is surprising, much less evidence for their claim. This Court's binding precedent certainly allows for the reduction of hours and allows for the reduction of hours if participants are stable.

The trial court found the final class claim moot, but still explained why it would rule in favor of Appellees. In consecutive paragraphs, it offers diametrically opposed rulings. First, it held skilled nursing hours "should be based on whether a service is medically necessary to correct or ameliorate a beneficiary's condition, not on whether or not the caregiver is able to provide those skills." Then it held hours can only be reduced "by

considering what amount of skilled nursing assistance can reasonably be expected to be provided by the caregiver." The Department agrees with the first holding, which means Appellee's third class claim should fail as skilled nursing services are only for participants and not caregivers.

Finally, the trial court erroneously granted permanent injunctions to certain class members. As the procedural history illustrates, certain class members filed for emergency injunctive relief rather than utilizing the administrative appeal process provided by the Medicaid Act. The trial court later granted individual permanent injunctions to those movants given their distinct relief requested. In order to grant the permanent injunctions, it relied on the class order, summary judgment order, and certain preliminary injunctions. As all of those orders have fundamental flaws, the permanent injunctions should be reversed along with the summary judgment order and class certification order.

## STATEMENT OF THE CASE

Certain medically fragile Medicaid members brought an action in 2015 against the Department alleging it did not approve a reasonable number of skilled nursing hours. In 2017, the trial court granted class certification for the following claims:

(1) Alliant's alleged failure to accord the treating doctors' recommendation the appropriate weight when determining a member's nursing hours; (2) Alliant improperly assumes that the primary caregivers can be taught all skilled nursing needs in order to wean class members off the program; (3) Alliant's alleged failure to consider the capacity of the class members' primary caregivers when determining how many nursing hours are appropriate.

Then the trial court granted summary judgment without a hearing despite relying on a series of disputed facts. Finally, the trial court granted a permanent injunction.

## A.    Early Periodic Screening Diagnostic and Treatment Under Georgia's Medicaid Program

### 1.    Statutory Background

The Department is the single state agency responsible for administering Georgia's Medicaid program. *See* 42 C.F.R. § 431.10; O.C.G.A. § 49-4-140. The Department issues policies and procedures governing the program. *See* 42 U.S.C. § 431.10(e)(1)(ii). Federal Medicaid regulations require each state to provide Early Periodic Screening Diagnostic and Treatment ("EPSDT") health services as a mandatory category of medical assistance. *See* 42 U.S.C. § 1396d(r).

EPSDT is Medicaid's comprehensive and preventive child health program for individuals under the age of 21. *See id.* That statutory provision defines EPSDT as "such other necessary health care, diagnostic services, treatment, and other measures described in 1396d(a) to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services whether or not such services are covered under the State Plan." *See id.; S.D. v. Hood*, 391 F.3d 581, 586 (5th Cir. 2004). "[E]ven if a category of medical services or treatments is mandatory under the Medicaid Act, participating states must provide those medical services or treatments for Medicaid recipients only if they are 'medically necessary.'" *Moore*, 637 F. 3d at 1233.

Participating states must provide medically necessary EPSDT services to eligible children, but the Medicaid Act does not set a uniform manner for states to implement that mandate. Rather, "the statute and regulations afford them discretion as to how to do so." *Moore,* 637 F.3d at 1238 (quoting *Katie A. ex rel. Ludin v. Los Angeles*, 481 F.3d 1150, 1159 (9th Cir. 2007)). The standard is "private duty nursing care to [each member] that is 'sufficient in amount duration, and scope to *reasonably achieve* its purpose, but 'may place appropriate limits on a service based on such criteria

8

as medical necessity.'" *Moore*, 637 F.3d at 1234 (quoting 42 C.F.R. § 440.230(b); (emphasis added)). "If there is a disagreement between the treating provider and the state's expert as to whether a service is medically necessary for a particular child, the state is responsible for making a decision, for the individual child, based on the evidence." *EPSDT – A Guide for States Coverage in the Medicaid Benefit for Children and Adolescents*, at 24 (June 2014) ("EPSDT Guide").

As required by the Medicaid Act, Georgia offers EPSDT services through GAPP. *See* [Dkt. 1 at 35; 312-10 at 4-6]. The in-home skilled nursing portion of GAPP provides skilled nursing services for children with medically fragile needs. [Dkt. 312-5 at 9]. GAPP is partially a teaching program designed to teach caregivers to care for their child. [*Id.* at 40]. As the caregivers learn, the training hours' portion of the skilled nursing services are reduced. [Dkt. 312-11 at 5]. It does not mean medically necessary skilled nursing hours are shifted to caregivers. [Dkt. 71-3 at 14].

The GAPP Manual sets forth the eligibility requirements, services provided, the application process, and the member's responsibilities. *See* [Dkt. 312-5]. GAPP in-home skilled nursing services are provided to medically fragile Medicaid members

under the age of 20 years, 11 months who require, based on a medical necessity determination, skilled nursing services or personal support services ("PSS"). *See* [Dkt. 4-7 at 2; 312-5 at 9,11]. GAPP skilled nursing services are intended to provide care for the skilled needs of the member based upon medical necessity and are not intended to be for the caregivers. *See* [Dkt. 312-5 at 9; 312-16 at 6-8].

## 2.    Utilization Review

Utilization review is required by the Medicaid Act for certain categories of service. *See* 42 U.S.C. § 1396a(30); 42 C.F.R. §§ 431.205, 456. With regard to EPSDT nursing hours, the number of hours governs the review period. [Dkt. 312-5 at 29-30].

Alliant is the utilization review entity for GAPP services, and the Department contracts with them to determine whether the services requested are medically necessary. [Dkt. 312-12 at 3]. Alliant's medical review team of doctors and nurses reviews the medical records, hospital records, home health nurses' notes, seizure logs, medical specialist letters, and treating physician's office notes. [Dkt. 312-13]. "Medical necessity is determined by reviewing all documentation that is submitted by the provider or

agency to the medical review team to review that child's current status and their individual needs." [Dkt. 71-3 at 3].

For each review team, there are one or two physicians along with three or four nurses, and a Department representative. [Dkt. 312-14 at 6-7]. The physician will either be a pediatrician or pediatric neurologist with experience in the care of medically complex children. [Dkt. 312-13 at 2]. They determine the appropriate number of skilled nursing hours via a joint decision of the entire committee. [Dkt 312-14 at 7, 9-10].

To assist this process, Dr. Michael Papciak and Dr. Gary Miller created a scoring tool in 2014. [Dkt. 312-14 at 7-8; 312-15 at 5-6]. They reviewed tools used by several other states to arrive at the best model. [Dkt. 312-14 at 8].

The scoring tool ensures all medical issues are considered. [Id. at 13]. It is a guideline for a range of hours and if the treating physician's requested hours are not in the range, the team conducts another discussion about the case to ensure the appropriate number of hours are allocated. [Dkt. 312-14 at 13; 312-15 at 5-6].

Alliant provides an opportunity for members to submit additional information or request reconsideration. [Dkt. 71-3 at 11-13; 71-4]. If the member does not do so, Alliant sends out a

11

"Final Determination Letter For Services From The Georgia Pediatric Program." *See* [Dkt. 71-5]. The notice discusses the administrative appeal process. [*Id.* at 3-4].

### 3. Alliant's Review Team

Dr. Papciak worked for Alliant for 28 years as a peer reviewer and case consultant. [Dkt. 312-14 at 3-5]. Dr. Miller began as a peer reviewer at Alliant in the 1980s and left in December 2016 as the medical director. [Dkt. 312-15 at 3]. Currently, Dr. Eric Zurbrugg is on the medical review team and he began practicing medicine in 1971. [Dkt. 312-17 at 3-4, 7]. He practiced as a pediatric neurologist in both private practice and hospital settings.  [*Id.* at 3-7]. The other physician is Dr. Susanne Schuessler, who began practicing medicine in 1985 and has a private pediatrics practice. [Dkt. 312-18 at 3-5].

There are several nurses on the review team. [Dkt. 312-18 at 7; 312-17 at 8-9]. Brianne Taylor is a licensed nurse who began practicing in 2008. [Dkt. 312-19 at 3]. She began at a neonatal intensive care unit ("NICU") then became a home health nurse in pediatrics. [*Id.* at 4-6]. Prior to joining Alliant, she also worked in labor and delivery, dialysis and was a clinical supervisor for Maxim.  [*Id.* at 7].

Stephanie Rooney began practicing nursing in 2011. [Dkt. 312-20 at 3]. Prior to joining Alliant, she spent seven years working in the NICU at Northside Hospital. [*Id.* at 4]. Sarah Reams began practicing nursing in 2008 and began her career at a NICU in Texas. [Dkt. 312-21 at 3]. She then went to a vascular clinic in Georgia and worked in the NICU at Northside Hospital. [*Id.* at 3-8].

Jennifer Purcell began practicing nursing in 2006 at Northside Hospital's NICU. [Dkt. 312-22 at 3-4]. After working in the NICU for six years, she joined Alliant. [*Id.* at 4]. Ms. Michelle Sehenuk began practicing nursing in 2000. [Dkt. 312-11 at 3]. Prior to joining Alliant, she spent 16 years at DeKalb Medical Center, 13 of those years she worked in the NICU. [*Id.* at 4]. Prior to 2018, Kaylan Bifaro was part of the Alliant medical review team. [Dkt. 314-19 at 12]. She practiced nursing for 13 years and spent six and a half years as a NICU nurse. [Dkt. 272 at 4].

## B. Certain Purported Class Members Challenge EPSDT Decisions

The case began with one named plaintiff bringing suit because Alliant determined the medically necessary skilled nursing hours were less than those hours requested by the

plaintiff. Later, two more plaintiffs brought separate actions against the Department because it approved less skilled nursing hours than they requested. Those actions were subsequently consolidated and they became named plaintiffs. After class certification, additional purported class members brought motions seeking individual injunctive relief because Alliant found the medically necessary skilled nursing hours were below those hours requested by the class members.

### 1. MH

MH is a medically fragile Medicaid recipient with certain skilled nursing needs who receives nursing paid for by the Department. See [Dkt. 1 at 2; 312-5 at 10].[1] MH originally sought 18 hours of skilled nursing along with 6 hours of PSS. [Dkt. 1 at 2]. PSS is care to members in the form of feeding, bathing, dressing, personal hygiene, meal preparation, light housekeeping, and assisting with mobility. [Dkt. 4-7 at 2; 312-5 at 11].[2]

In 2015, the trial court granted a TRO enjoining the Department from approving less than 18 hours a day of skilled nursing. [Dkt. 4; 13]. In August 2018, Appellees' counsel informed

---

[1] MH aged out of EPSDT.

[2] MH is the only plaintiff seeking PSS. [Dkt. 80 at 20].

the Department that MH's caregiver had a broken hand and requested a temporary increase to 24 hours a day of nursing. [Dkt. 312-6]. The 24 hours a day of skilled care remained in place for two years. [Dkt. 401-1].

On June 8, 2021, the trial court held a status conference where it directed Appellees to file for permanent injunctions for any class members who need it. [Dkt. 394]. MH delayed moving for a permanent injunction, but instead sought and received another TRO and preliminary injunction in August 2021. [Dkt. 394; 399; 427].

The Department's expert, Dr. Papciak, examined MH in 2018 and interviewed his primary caregiver. [Dkt. 273 at 9]. He found MH's caretaker is competent to provide care in activities of daily living, medication administration, suctioning, feeding, emergency protocols, and other areas. [*Id.* at 7]. While seizures occur daily, there are no reports of emergency seizure medication. [*Id.*]. There are no reports of ambulance transport or emergency room visits. [*Id.*]. MH is stable. [*Id.*].

Based upon the physical examination and review of MH's medical records, there is no basis for 24 hours a day of skilled nursing along with 6 PSS hours a day. [Dkt. 312-4 at 7; 399-3 at

7]. Dr. Papciak opined MH should receive 42 hours a week of skilled nursing along with 42 PSS hours a week. [Dkt. 312-4 at 7].

Likewise, Alliant reviewed MH's renewal request for the period November 2021 through January 2022. [Dkt. 421-1]. After reviewing the request, including the physician's request, Alliant approved 63 hours of skilled nursing along with 35 hours a week of PSS. [*Id.* at 5]. Alliant notes that MH's proffered declaration does not change his skilled needs. [*Id.* at 5-6]. Nor does the declaration show he requires more than 24 hours a day of care. [*Id.*].[3] Moreover, the Department is the only party, which has expert testimony to support its position on MH's injunction. *See* [Dkt. 312-4].

Alliant's approval of 42 hours of skilled nursing care per week for MH is reasonable and MH's treating physician's request for 24 hours of skilled nursing a day along with 5 hours of PSS a day is not medically necessary.

---

[3] The Department objected to all of the opinion testimony in the declarations attached or relied upon by the permanent injunction motion. *See* [Dkt. 399-3; 407-2; 400-3; 412; 412-2; 412-3; 412-4; 412-5; 412-6; 421 n. 8]. *See also* Fed. R. Evid. 702.

16

### 2.   CC

Appellee CC is a medically fragile Medicaid recipient with certain skilled needs who receives skilled nursing paid for by the Department. [Dkt. 408-1]. CC sought and the trial court granted a TRO, which enjoined the Department from approving less than 24 hours a day of skilled nursing for 3 months. [Dkt. 107-08; 113]. The trial court subsequently consolidated CC's case into this matter. [Dkt. 121]. On June 8, 2021, the trial court held a status conference where it directed Appellees to file for permanent injunction for any class members where permanent relief is necessary. [Dkt. 394]. CC delayed moving for a permanent injunction, instead sought and received a TRO and preliminary injunction. [Dkt. 394; 407; 411].

The Department's expert, Dr. Papciak, performed a physical exam on Appellee CC and interviewed CC's mother. [Dkt. 312-8 at 7]. There are no documented medical complications or circumstances justifying 24 hours a day of skilled nursing. [*Id.*]. CC requires 56 hours of skilled nursing per week along with 28 hours of PSS. [*Id.*].

Likewise, Alliant studied CC's renewal request for the August 2021 period, including the treating physician's request. [Dkt. 408-1 at 3-4]. The request was incomplete until August 6, 2021 and

relied upon a year-old doctor check-up. [*Id.*]. Upon completion, Alliant approved 35 hours a week of skilled nursing along with 21 PSS hours a week, which is a new service for CC. [*Id.* at 4-5]. The approved hours are reasonable and CC's physician's request for 24 hours a day of skilled nursing care is not medically necessary.

### 3. EC

Appellee EC is a medically fragile Medicaid recipient with certain skilled nursing needs who receives skilled nursing paid for by the Department. [Dkt. 421-3]. EC sought and the trial court granted a TRO, which required the Department to approve 140 hours of skilled nursing per week until further order of the court. [Dkt. 164; 166]. The trial court subsequently consolidated EC's case into this matter. [Dkt. 182].

The Department's expert, Dr. Papciak, conducted a physical exam of Appellee EC and interviewed her father on January 23, 2019. [Dkt. 312-9 at 7]. EC's mother is a home health nurse. [*Id*]. Dr. Papciak found EC requires 56 hours of skilled care along with 84 hours of PSS. [*Id.* at 8].

Alliant reviewed EC's request for skilled nursing for the period beginning October 2021, including the physician's request. [Dkt. 421-3 at 4-5]. The packet showed EC's vital signs remained stable throughout the period at issue. [*Id.* at 4]. Alliant approved a

reasonable 56 hours of skilled nursing care per week, EC's physician's request for 140 hours of skilled nursing care per week is not medically necessary.

### 4. KM

KM is a medically fragile GAPP participant with certain skilled needs who receives nursing paid for by the Department. *See* [Dkt. 421-4]. KM sought and the trial court granted KM a preliminary injunction, which required the Department to approve 84 hours per week of skilled nursing. [Dkt. 204; 219].

For the December 2021 renewal period, Alliant's medical review team considered KM's request, including the physician's request, and approved 49 hours of skilled nursing per week along with 28 hours per week of PSS. [Dkt. 421-4 at 3-5]. The PSS hours increased from 21 to 28 hours per week. Alliant's approval of 49 hours per week of skilled nursing is reasonable and KM's physician request for 84 hours per week of skilled nursing is not medically necessary.

### 5. RV

RV is a medically fragile GAPP participant with certain skilled needs who receives skilled nursing paid for by the Department. *See* [Dkt. 421-5]. RV sought and the trial court

granted a TRO to RV, which required the Department to approve 140 hours of skilled nursing a week. [Dkt. 205; 216].

As the 140 hours approved, along with 5 days a week of seven and a half hours of skilled nursing provided by RV's school, far exceeds 24 hours a day of nursing services, the Department sought reconsideration. [Dkt. 227]. The trial court ruled the Department may reduce the approved hours by the number of skilled nursing hours RV actually receives in school during a given week. [Dkt. 266].[4]

For December 2021 renewal period, Alliant's medical review team reviewed RV's request, including the physician's request, and approved 84 hours per week of skilled nursing along with 28 hours of PSS. [Dkt. 421-5 at 3-5]. The PSS hours are an increase in RV's services. [*Id.*]. Alliant's approval of 84 hours of skilled nursing care for RV is reasonable and RV's physician's request for 140 hours of skilled nursing care a week is not medically necessary.

---

[4] It is not clear how reducing hours after they are used is a workable solution to the problem of an injunction for more than 24 hours a day of skilled nursing. [Dkt. 227-1 at 7-8; 266].

### 6. BP

Appellee BP is a medically fragile GAPP participant with certain skilled needs who receives skilled nursing paid for by the Department. *See* [Dkt. 421-6]. BP sought and the trial court granted BP a TRO, which required the Department to approve 168 hours per week of skilled nursing care. [Dkt. 283; 304].

Because Appellees failed to promptly seek a permanent injunction, BP's TRO expired, BP then filed another TRO in August 2021. [Dkt. 394; 400]. The trial court orally granted the second TRO and five months later a final order was entered. [Dkt. 405; 428].

Alliant's medical review team reviewed BP's renewal request for August 2021, including the physician's request, and approved 40 hours of skilled nursing hours along with 40 hours of PSS. [Dkt. 421-6 at 3-4]. The PSS hours are a new addition to BP's services. [*Id.* at 4-5].

BP's parent requested reconsideration. [*Id.* at 6]. They offered a new letter from BP's physician, which provided a more complete picture. [*Id.*]. Based upon the new information, Alliant increased BP's skilled nursing hours to 70 hours a week. [*Id.*]. Alliant's approval of 70 hours a week of skilled nursing for BP is reasonable

and BP's physician's request for 24 hours a day of skilled care are not medically necessary.

### 7.  NH

NH is a medically fragile GAPP participant with certain skilled needs who receives skilled nursing paid for by the Department. *See* [Dkt. 421-7]. NH sought and the trial court granted NH a TRO, which required the Department to approve 126 hours of skilled nursing care. [Dkt. 322; 348].[5]

For the November 2021 renewal period, Alliant's medical review team considered NH's request along with the physician's request, and approved 48 hours a week of skilled along with 16 PSS hours a week as medically necessary. [Dkt. 421-7 at 3-5]. Alliant's approval of 48 hours per week of skilled nursing for NH is reasonable and NH's physician's request for 126 hours of skilled nursing per week is not medically necessary.

### 8.  EP

EP is a medically fragile GAPP participant with certain skilled needs who receives nursing paid for by the Department. *See* [Dkt. 421-8]. EP sought and the trial court granted EP a

---

[5] The Court again ordered that the 126 hours can be reduced by the actual number of skilled nursing hours provided by the local school each week. [Dkt. 348 at 6].

preliminary injunction, which required the Department to approve 98 hours per week of skilled nursing. [Dkt. 375; 420].

For the October 2021 renewal period, Alliant reviewed EP's request, including the physician's request for hours, and approved 40 hours a week of skilled nursing hours along with 14 hours a week of PSS. [Dkt. 421-8 at 3-5]. Throughout the period at issue, EP's vital signs remained stable. [*Id*. at 4]. Alliant's approval of 40 hours per week of skilled nursing care for EP is reasonable and EP's physician's request for 98 hours per week of skilled nursing is not medically necessary.

### C.  Proceedings Below

On April 29, 2015, Appellee MH filed his Complaint alleging violations of the Medicaid Act and seeking class certification. [Dkt. 1]. Prior to the filing of this lawsuit, MH filed a similar lawsuit in 2008 seeking class certification, injunctive relief, and declaratory relief, alleging the Department violated the Medicaid Act. *Hunter v. Medows*, Civil Action No. 1:08-CV-2930, United States District Court for the Northern District of Georgia ("*Hunter I*").

In *Hunter I*, the Department moved for partial summary judgment, which the trial court granted on all grounds relevant to this matter except as to the factual determination of the number

of medically necessary skilled nursing hours. [Dkt. 14-5]. The trial court held the Department did not violate the Medicaid Act in the provision of case management services and PSS to MH. [*Id.* at 6]. The trial court held the Department provided effective notice to MH. [*Id.* at 7]. At the end of that matter in 2013, the trial court entered a six-month injunction. [Dkt. 14-7 at 33-34; 14-8 at 2].

In the case before this Court, the trial court dismissed MH's claim about case management services as barred by the *Hunter I* summary judgment decision. [Dkt. 26 at 11-12]. The trial court dismissed MH's claim about the notice letters as barred by the *Hunter I* summary judgment decision. [*Id.* at 12-13].[6]

On October 11, 2016, Appellee MH moved for class certification. [Dkt. 62]. The trial court granted class certification for three claims: "(1) Alliant's alleged failure to accord the treating doctors' recommendation the appropriate weight when determining a member's nursing hours; (2) Alliant improperly assumes that the primary caregivers can be taught all skilled nursing needs in order to wean class members off the program; (3) Alliant's alleged failure to consider the capacity of the class members' primary caregivers when determining how many

_____

[6]Pursuant to the trial court's orders here, any claim in this case on the notice letters is no longer viable. [Dkt. 26; 238; 270].

nursing hours are appropriate." [Dkt. 80 at 5].[7] The trial court designated MH as the named plaintiff. [*Id.*].

After class certification, three additional actions were merged into this case. [Dkt. 105; 121; 123; 153; 162; 182]. The consolidation added named plaintiffs CC, HK, and EC. [*Id.*].[8] Pursuant to immediate hearing requests, the trial court enjoined the Department from "reducing the skilled nursing care hours provided to [Appellee] CC below 24 hours per day, " and enjoined the Department "from denying 140 hours per week of private duty nursing services [to Appellee EC]." [Dkt. 113 at 6; 164; 166 at 7].

Appellees then sought to amend the complaint to add additional class issues without complying with the Federal Rules, which the trial court denied. *See* [Dkt. 203; 238]. Appellees next attempted to add the issues through a subclass, which the trial court denied. [Dkt. 248; 270].

During the pendency of this litigation. Appellees brought individual motions for injunctions on behalf of class members AF,[9]

---

[7] The Department sought interlocutory review by this Court, which was denied. [Dkt. 87].

[8] HK moved out of state and is no longer part of this action. [Dkt. 286].

[9] AF later passed away. [Dkt. 412-1 at 2 n.1].

KM, RV, BP, NH, and EP. [Dkt. 204; 205; 228; 322; 375]. After hearing, the trial court enjoined the Department from denying 84 hours of skilled nursing per week to KM, 140 hours of skilled nursing per week to RV, 168 hours per week to BP, 126 hours of skilled nursing per week to NH (subject to adjustment by actual hours provided by the school), and 98 hours of skilled nursing to EP. [Dkt. 216 at 7; 219 at 7; 289; 348 at 6; 420 at 6]. The Department sought reconsideration of RV's skilled nursing hours, which was granted as the hours ordered exceeded 24 hours per day during the school year. [Dkt. 227; 266].

At the conclusion of discovery and after five years of litigation, Appellees attempted to add a new claim to require the Department to ensure all skilled nursing hours approved by Alliant are provided to RV. *See* [Dkt. 288]. The trial court denied Appellees' request. [Dkt. 305].

Appellant moved for partial summary judgment and Appellees' moved for summary judgment on all three class claims. [Dkt. 312; 314]. The trial court granted summary judgment to Appellees on the first two class claims and found the class claim relating to caregiver capacity to be moot. [Dkt. 386].

On June 8, 2021, the trial court held a status conference where it directed Appellees to file for permanent injunction for

any class members where permanent relief is necessary. [Dkt. 394]. Notwithstanding this directive, Appellees filed another three motions for TRO. [Dkt. 399; 400; 407].

Then almost 6 months after the trial court's directive and after three separate TRO hearings, Appellees finally moved for permanent injunctions for certain class members requiring the Department to approve skilled nursing hours requested by treating physicians, which the trial court granted. [Dkt. 412-1 at 1-2; 433]. The trial court granted individual injunctions for BP, NH, RV, CC, EC, EP, KM, and MH, "given the distinct nature of injunctive relief requested." [Dkt. 433 at 4; 434-41]. Appellant filed a notice of appeal on June 10, 2022. [Dkt. 444].

In this matter, each movant must show that the medical information provided to Alliant shows the hours approved are not sufficient in amount, duration, and scope to reasonably achieve the treatment's purpose. *See Moore*, 637 F.3d at 1258. "If there is a disagreement between the treating provider and the state's expert as to whether a service is medically necessary for a particular child, the state is responsible for making a decision, for the individual child, based on the evidence." EPSDT Guide at 24.

## D.   Standard of Review

Class certification is reviewed for abuse of discretion. *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1251 (11th. Cir. 2003). Whether the trial court "applied the correct legal standard in reaching its decision on class certification . . . is a legal question that [this Court] review[s] de novo." *Id.* (quoting *James v City of Dallas*, 254 F.3d 551, 562 (5th Cir. 2001)).

This Court reviews "a summary judgment ruling de novo, applying the same legal standard used by the district court." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003). In reviewing an injunction, this Court uses an abuse of discretion standard. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004).

## SUMMARY OF ARGUMENT

This Court should reverse the trial court's class certification, preliminary injunctions, summary judgment order, and permanent injunctions. First, the trial court should not have certified a class. Individualized facts predominate the common issues of law in every area of this case. For each purported class member, the trial court needs to make individual determinations to see if they are receiving the medically necessary hours.

Second, the trial court should not have granted preliminary injunctions in this matter. In each instance, Alliant approved a

reasonable number of skilled nursing hours. But most importantly, the trial court utilized the incorrect standard. It required the Department to show it approved the correct number of hours while the burden was on Appellees to show the number of hours they requested were medically necessary. Just because the treating physician requested the hours does not mean they are medically necessary.

Third, the trial court erroneously granted summary judgment based on an incorrect interpretation of *Moore*. *Moore* requires Alliant to consider the treating physician's request, but makes clear the request is not dispositive. Instead, the Department only has an obligation to authorize medically necessary hours. Appellees accuse the Department of shifting medically necessary skilled nursing hours unto caregivers. But that is not what the evidence shows. Rather, the Department reevaluates the number of medically necessary nursing hours as the GAPP member's situation changes. If a child's situation becomes more stable, the number of medically necessary hours will likely drop. Likewise, the Department funds training for caregivers when medically necessary. When caregivers become competent, the training hours stop.

Similarly, there is no requirement in EPSDT for the Department to consider convenience to caregivers in allocating skilled nursing hours. And instead of Appellee's position of utilizing federal judges to make administrative decisions, the Medicaid Act provides for an administrative review process. That process can expeditiously review Alliant's decisions.

Finally, the trial court incorrectly granted permanent injunctive relief to certain class members through individual permanent injunctions. Without class certification, only the named plaintiffs could seek relief. Without erroneously relying upon the treating physician's request, each movant could not receive relief. Each permanent injunction is based upon the trial court's prior flawed orders.

## ARGUMENT

### I.　Appellees did not meet the requirements for class certification.

This matter should not be a class action. Federal Rule of Civil Procedure 23(a) requires that Appellees prove:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately
protect the interests of the class.

"These four prerequisites of Rule 23(a) are commonly referred to
as 'numerosity, commonality, typicality, and adequacy of
representation, and they are designed to limit class claims to
those fairly encompassed by the named plaintiffs' individual
claims.'" *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181,
1188 (11th Cir. 2003) (citing *Prado-Steiman v. Bush*, 221 F.3d
1266, 1278 (11th Cir. 2000)). "Failure to establish any one of these
four factors and at least one of the alternative requirements of
Rule 23(b) precludes class certification." *Id*. In this matter,
Appellees assert Rule 23(b)(2) is applicable and it requires that
"the party opposing the class has acted or refused to act on
grounds that apply generally to the class, so that final injunctive
relief or corresponding declaratory relief is appropriate respecting
the class as a whole." [Dkt. 1 at 45-46].

A.    **Appellees failed to show commonality.**

Appellees failed to show all members of the proposed class
suffered the same injury. *See Wal-Mart Stores, Inc. v. Dukes*, 564
U.S. 338, 349-50 (2011) (quoting *General Tel. Co. of the Sw. v.
Falcon*, 457 U.S. 147, 157 (1982)). "Any competently crafted class
complaint literally raises common 'questions.' What matters to

31

class certification, however, is not the raising of common 'questions' - even in droves - but, rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 131-32 (2009)).

Here, the trial court granted class status to three claims, but for each claim, there is no common injury. The first claim is Alliant's "alleged failure to accord the treating doctor's recommendation the appropriate weight when determining a member's nursing hours." [Dkt. 80 at 4-5]. Yet, the determination of medically necessary skilled nursing hours is a fact specific individualized inquiry. *Hunter I*, No.1:08CV2930, slip op. at 12 (N.D. Ga. May 22, 2013); Dkt. 433 (explaining the permanent injunction order "addresses each Plaintiff and Class Member separately given the distinct nature of the injunctive relief requested.").

If a GAPP consumer seeks skilled nursing hours, Alliant evaluates the request to determine what hours are medically necessary. Even if Alliant gives no weight to the treating physician's recommendation, there is no injury unless the nursing hours that Alliant approves are below those that are reasonably

medically necessary. There can only be an injury if Alliant did not approve the reasonably medically necessary skilled hours. *See Moore*, 637 F.3d at 1255 (holding the "record presents material issues of fact over what amount of private duty nursing hours are medically necessary for Moore, which must be resolved by a factfinder at trial"). That is a fact specific inquiry which is different for every individual.

The second alleged policy is that Alliant assumes caregivers can be taught all skilled nursing needs in order to wean class members off the *program*. There was no evidence showing it is the goal of the program to wean consumers off. Each named plaintiff only had their skilled nursing hours reduced or approved below the amount requested by the treating physician. [Dkt. 13 at 9;166 at 4; 411 at 4; 427 at 4; 433 at 5]. If there is no common question, how can there be a common answer?[10]

---

[10] Appellees appeared to change their claim to the Department improperly reduced skilled nursing hours. [Dkt. 386 at 3]. Even under that claim, the trial court applied the wrong standard. Regarding MH, the trial court found the Department's "decision to reduce to 12 hours per day was not based on medical necessity but instead on the policy and practice of the GAPP program to wean nursing care if a child has been medically stable." [*Id.* at 8]. Yet this Court already held the Department "may permissibly conclude that persons whose conditions are worsening or who require frequent hospitalizations have a higher degree of medical necessity than those who are chronically stable." *Moore*, 637 F.3d

The last policy is Alliant's alleged failure to consider the capacity of the class members' caregivers when determining how many nursing hours are appropriate.[11] There is no legal requirement to consider caregiver capacity. And even if the Department does consider the caregiver's capacity, the results are fact specific. For example, if a caregiver is a retiree should that class member receive more nursing hours than one cared for by a single parent who works full time? Finding the policy unlawful does not have any effect on the alleged class unless there is a consideration of the facts of the particular caregiver.[12] This

---

at 1258. Moreover, such reductions are a fact specific inquiry. *See, e.g.*, [Dkt. 437 (requiring 168 hours per week for CC); 438 (requiring 140 hours per week for EC); 441 (requiring 168 hours per week for MH)].

[11] The trial court found this claim moot. [Dkt. 386 at 18].

[12] The trial court cites to a Pennsylvania case as authority for commonality. [Dkt. 80 at 17 (citing *P.V. ex rel. Valentin v. School District of Philadelphia*, 289 F.R.D. 227, 228 (E.D. Pa. 2013))]. That case is neither binding nor helpful to Appellees' case. As described by the trial court, the Philadelphia school system had a policy of automatically transferring autistic students from one school to another without considering their individualized circumstances. [*Id.*]. That court concluded there was commonality because all of the students suffered the same harm, an improper transfer. [*Id.* at 234]. Thus, that court could end the improper transfers with the stroke of a pen as there was "no need for individualized determinations of the propriety of injunctive relief." *P.V. ex rel. Valentin*, 289 F.R.D. at 233.

argument just demonstrates why this case should not be a class action.

## B.    Appellees failed to show typicality.

"[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Prado-Steiman v. Bush*, 221 F.3d at 1279. "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. GMC*, 133 F.3d 388, 399 (6th Cir. 1998). "[W]e have repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Prado-Steiman v. Bush*, 221 F.3d at 1279 (quoting *Falcon*, 457 U.S. at 156). "It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class." *Id*.

---

The difference here is that changing of any of the alleged policies may or may not change anything with regard to the purported class members. There still needs to be an individualized determination. *See, e.g,* [Dkt. 437 (permanent injunction for CC); 438 (permanent injunction for EC); 441 (permanent injunction for MH)].

The trial court held the named plaintiffs' claims are typical because the class is "challenging the legality of GMCF's general policies and practices, not the legality of those policies as applied to each particular GAPP member." [Dkt. 80 at 20]. However, presuming arguendo the existences of such policies, harm can only follow from the purported policies being applied to a recipient. "In order to satisfy the injury-in-fact requirement of standing, a plaintiff may show that he "has sustained or is immediately in danger of sustaining some direct injury." *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019) (citations omitted).

If this Court determines Appellee MH is not receiving all medically necessary skilled nursing hours, it does not mean the Department did not provide all medically necessary skilled nursing hours to the putative class members. The same is true for the other named plaintiffs. For each purported class member, there needs to be a fact specific inquiry. Even the trial court noted "the distinct nature of injunctive relief requested." [Dkt. 433 at 4]. Thus, each class representative received their own individual permanent and preliminary injunctions. [Dkt. 9; 13; 141; 166; 215-16; 219; 233; 266; 289; 304; 328; 348; 378; 405; 411; 420; 427-28; 434-41]. "Typicality cannot be satisfied when a 'named plaintiff who proved his own claim would not necessarily have proved

anybody else's claim.'" *Hillis v. Equifax Consumer Servs.*, 237 F.R.D. 491, 499 (N.D. Ga. 2006) (quoting *Sprague*, 133 F.3d at 399).[13]

### C.   Appellees failed to satisfy Federal Rule of Civil Procedure 23(b)(2).

Even if the trial court's analysis of the Rule 23(a) factors is correct, a class is unnecessary in this action as Appellees failed to satisfy the requirements of (b). Appellees sought a class under Rule 23(b)(2), which requires "that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).[14] Appellees "bear[] the burden

---

[13] The Department also objects to numerosity. One can only be part of this class if the member is not receiving all medically necessary hours. And the only such individuals that Appellees offered are the 8 movants seeking individualized injunctions. A "class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way. Identifying class members is administratively feasible when it is a 'manageable process that does not require much, if any, individual inquiry." *Karhu v. Vital Pharms., Inc.*, 621 Fed. App'x. 945, 946 (11th Cir. 2015) (quoting *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x. 782, 787 (11th Cir. 2014)).

[14] The trial court held in the class order that "this class action can be resolved in one stroke with an injunction or declaratory judgment finding the Defendant's policies and practices to be in violation of the Medicaid Act." [Dkt. 80 at 25]. Then at the

of establishing every element of Rule 23, *see Valley Drug*, 350 F.3d at 1187, and a district court's factual findings must find support in the evidence before it." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009). "Another consideration in the Rule 23(b)(2) analysis is whether class certification is necessary." *Cromwell v. Kobach*, 199 F. Supp. 3d 1292, 1313 (D. Kan. 2016)

According to the trial court's class order, Appellees are "challenging the legality of [Alliant]'s general policies and practices, not the legality of those policies and practices as applied to each particular GAPP member." [Dkt. 80 at 20]. As the Southern District of Alabama explained, "the *United Farmworkers* court found that it did not matter whether the case should have been certified as a class action, because relief granted to the individual plaintiffs would necessarily inure to the benefit of potential class members." *M.R. v. Bd. of Sch. Comm'rs*, 286 F.R.D. 510, 519-20 (S.D. Ala. 2012) (citing *United Farmworkers of Fla. Hous. Project, Inc. v. Delray Beach*, 493 F.2d 799, 812 (5th Cir. 1974)).

Likewise in this action, Appellees are seeking to have certain policies enjoined and declared violative of the Medicaid Act. If

---

conclusion of this case, it entered individualized permanent injunctions for class members. *See* [Dkt. 434-41].

Appellees succeed and the trial court enjoins the Department, the policies would no longer apply to them or any other member of the purported class now or in the future. That is, Appellees failed to show that a class is necessary under Rule 23(b)(2). *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir. 1973) (holding if "relief sought is prohibitory, an action seeking declaratory or injunctive relief against state officials on the ground of unconstitutionality of a statute or administrative practice is the archetype of one where class action designation is largely a formality."); *Sandford v. R. L. Coleman Realty Co.*, 573 F.2d 173, 178 (4th Cir. 1978) (holding if "plaintiffs could receive the same injunctive relief in their individual action..., class certification was unnecessary in order to give the plaintiffs the injunctive relief they requested through class certification."); *Craft v. Memphis Light, Gas & Water Div.*, 534 F.2d 684, 686 (6th Cir. 1976) (holding that as "to a Rule 23(b)(2) class...such relief to the extent 'granted [would] . . . accrue to the benefit of others similarly situated', and, consequently,..., 'no useful purpose would be served by permitting this case to proceed as a class action' because 'the determination of the constitutional question can be made by the Court...regardless of whether this action is treated as an individual action or as a class action.'"); *Kansas Health Care Ass'n v. Kan. Dep't of Soc. & Rehab.*

*Servs.*, 31 F.3d 1536, 1548 (10th Cir. 1994) (holding "'class certification is unnecessary if all the class members will benefit from an injunction issued on behalf of the named plaintiffs.'").

## II. Preliminary Injunctions must fall.

### A. The trial court repeatedly granted TROs and preliminary injunctions simultaneously.

For almost every TRO, the trial court granted it and a preliminary injunction at the same hearing and almost always had the hearing on an expedited basis. The Department consistently objected to this process. *See, e.g.*, [Dkt. 13; 113; 166; 411; 427].[15]

"Where the injunction turns on the resolution of bitterly disputed facts, however, an evidentiary hearing is normally required to decide credibility issues." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1538 (11th Cir. 1989). Here, the trial court ruled that after considering the evidence at the TRO hearing, "[h]olding another hearing on the

_____

[15]Typically, "[o]nce an order of permanent injunction is entered, any preliminary injunction merges with it, and appeal may be had only from the order of permanent injunction." *Associated Builders & Contractors Fla. E. Coast Chptr v. Miami-Dade Cty.*, 594 F.3d 1321, 1323-24 (11th Cir. 2010). However, in the event this Court vacates the permanent injunctions and remands, this Court should also reverse the preliminary injunctions.

preliminary injunction motion will be a needless waste of time and resources. So I am going to grant both." [Dkt. 10 at 39]. The decision denied the Department a meaningful opportunity to oppose the motions for preliminary injunction.

The trial court regularly expedited the hearings on preliminary injunctions. *See, e.g.*, [Dkt.9 (granting preliminary injunction one week after filing); 108 (granting injunction three days after filing)];[16] 165 (granting preliminary injunction three days after motion filed)].[17] A "two-day notice, coupled with thirty minutes for oral presentations can hardly be said to constitute a meaningful opportunity to oppose appellees' motion for preliminary injunction." *All Care Nursing Serv., Inc.*, 887 F.2d at 1538 (citations omitted). The expedited process again impaired the

---

[16] At that time, the trial court only granted a three-month injunction.

[17] The trial court also held that the Department did not provide rebuttal to the treating physicians' claims. *See, e.g.*, [Dkt. 411 at 5; 427 at 4]. To the extent, it was referring to physical examinations, it is not clear how the Department would have time to conduct those exams prior to the expedited hearing. *See, e.g.* [Dkt.198 (granting request for EC physical exam on December 17, 2018, which was set to occur on January 16, 2019); 211 ((granting request for CC physical exam on February 20, 2019, which was set to occur on March 1, 2019)]. At the same time, the Department did offer rebuttal evidence in the form of declarations from Alliant. *See, e.g.*, [Dkt. 401-3; 408-1].

Department's ability to oppose the motions for preliminary injunction.

### B.    The trial court applied the wrong standard.

Likewise, the trial court utilized the wrong standard in granting the preliminary injunctions. "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion"' as to each of the four prerequisites." *Siegel v. Lepore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (citations omitted).

Yet, the trial court placed the burden on the Department. It held it "is not convinced that the denial of [EC]'s private duty nursing hours by [Appellant] is based on a determination of medical necessity." [Dkt. 166 at 5]. It "is not convinced that the reduction of [MH]'s private duty nursing hours by [Appellant] is based upon a determination of medical necessity." [Dkt. 427 at 5]. It is "not convinced that the reduction of [CC]'s private duty nursing hours by [Appellant] is based on a determination of medical necessity." [Dkt. 411 at 5].

The burden should have been on Appellees to prove the number of reasonable medically necessary skilled nursing hours they should have received. The Department should not have the burden to prove its actions were appropriate. The "pivotal issue is

only whether [the authorized] hours are sufficient in amount to reasonably achieve the purposes of private duty nursing services to correct or ameliorate [Appellee]'s condition." *Moore*, 637 F.3d at 1257-58. That is, whether the hours approved are reasonable for the purpose. 42 C.F.R. § 440.230.

### III. Appellees failed to satisfy the requirements for summary judgment.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 636 (11th Cir. 1991).

At the outset, the Department disagrees with the trial court's holding that "undisputed facts show that the alleged policies and practices in the class allegations exist and that they cause numerous class members to be approved for fewer hours than are medically necessary under the Medicaid Act." [Dkt. 386 at 18]. There is significant testimony from Alliant and from the Department's expert that the approved number of skilled nursing hours are reasonable. *See, e.g.* [Dkt. 273 at 4-15, 24-30; 421-1; 421-2; 421-3].

Moreover, the trial court relied solely on the Appellees' statement of facts to make its summary judgment ruling yet at the same time ruled the "undisputed facts" show a violation of the Medicaid Act. *See* [Dkt. 386 at 18]. The facts are disputed, as the Department's statement of facts makes clear. [Dkt. 312-2 at 9-10 (Alliant considers the physician's recommendation), 10 (Alliant approves teaching hours); 334 at 29-30 (there is no weaning).

Beyond the problem of making disputed factual findings at the summary judgment stage, the trial court made erroneous legal conclusions. *Moore* requires the Department to consider the treating physician's recommendation, and there is no dispute that the Department does so. *Moore* is also clear that the Department may reduce hours if a GAPP member is stable. And there can be no dispute that if teaching hours are no longer required, teaching hours no longer need to be approved. Finally, there is no legal requirement for the Department to consider caregiver capacity in approving skilled nursing hours as skilled nursing hours are for the GAPP consumer only.

**A.    The Department considered the treating physician's request.**

44

One of Appellees' central claims is Alliant "fail[ed] to accord the treating doctor's recommendation the appropriate weight when determining a member's nursing hours." [Dkt. 80 at 5]. The trial court erroneously held the Department gave insufficient weight to the treating physician's recommendation. That was error. The Department *does* consider the treating physician's recommendation. And if the Department must give *more* weight, the trial court never specified how much.

"As this court ruled in *Moore*, the Department must consider the recommendation of the treating physician. Alliant "evaluated [the treating physician's] orders and the training needs of caregivers to arrive at its nursing hours decisions.…This is consistent with federal regulations, the federal CMS Manual, and our precedent." *Moore*, 637 at 1257 (citations omitted). While the court below held without citation, "[n]umerous [Department] and Alliant employees have testified regarding the failure to consider the treating physician's recommendation," the truth is the opposite. [Dkt. 386 at 13].

The evidence below is undisputed that the Department considered the treating physician's recommendation. [Dkt. 312-10 at 3; 312-18 at 6, 8, 11; 312-19 at 8]. Ms. Sehenuk, an Alliant nurse, testified "[w]e always consider the [treating physician's]

45

recommendation." [Dkt. 312-11 at 6]. The Department's nursing expert opined "Alliant considers each treating doctor's recommendation when determining the hours that are medically necessary." [Dkt. 272 at 4]. Likewise, Appellees' proffered doctor, Dr. Kathryn McCusker testified Alliant considers the treating physician's recommendation. [Dkt. 312-23 at 3]. Thus, the Department satisfied this Court's directive and Appellees should not prevail on this class claim.

Along with its holding that the Department did not give the treating physician's recommendation sufficient weight, in a Kafkaesque twist, the trial court declined to specify what is the appropriate weight. [Dkt. 386 at 14]. Instead, Appellees regularly asserted the Department must just *approve* the treating physician's requested amount, with no further review. For example, they argue "[Appellees] have a right to receive Medicaid-funded services that their treating physicians have determined are medically necessary." [Dkt. 1 at 46]. *See also* [Dkt. 4-1 at 25 (seeking injunction to "prohibit[ the Department] from denying nursing services ordered by [MH]'s treating physician"); 107-1 at 1 (seeking to "enjoin[ the Department] to approve private duty nursing services for [CC] in the amounts ordered by her treating physicians"); 164-1 at 1(request to "enjoin[ the Department] to

approve private duty nursing services for [EC] in the amounts
ordered by her treating physicians"); 399-1 at 17-18 (seeking to
"prohibit[ the Department] from denying the 24 hours per day of
private duty nursing services ordered by [MH]'s treating
physician"); 407-1 at 20-21 (seeking to "prohibit[ the Department]
from denying the 24 hours per day of private duty nursing services
ordered by [CC]'s treating physician"). That appears to be what
the trial court did. Every time it granted an injunction, it granted
exactly the number of hours requested by the treating physician.
*See* [Dkt.13 at 9-10, 16; 141 at 3-5; 166 at 3, 6-7; 216 at 3-4, 7-8;
219 at 3, 7; 233 at 3, 7; 304 at 2, 6; 348 at 3, 6; 411 at 3-4, 7; 420 at
3, 6; 427 at 3-4, 7; 428 at 3-4, 6]. In discussing the preliminary
injunctions, the trial court specifically held it "granted injunctive
relief to require [the Department] to provide the skilled hours
recommended by the treating physician, instead of the lower
hours approved by Alliant and [the Department]." [Dkt. 386 at 8].

The rule cannot be that the Department must simply
authorize whatever skilled hours that the treating physician
requests. That standard would be inconsistent with this Court's
precedence and CMS's guidance. As this Court previously held,
Appellees "contend[] that the state, and the courts as well, should
defer to [their] treating physician's judgment of how many hours

47

are medically necessary for [Appellees], so long as the treating physician's nursing hours recommendation is within the reasonable standards of medical care and is not tainted with fraud or abuse of the Medicaid system. Congress could have said that too, but it did not." *Moore*, 637 F.3d at 1259.

This Court also held that neither the Department nor the child's doctor is the final arbiter on medically necessary hours. *See id.* Yet, the federal government's guidance is "[i]f there is a disagreement between the treating provider and the state's expert as to whether a service is medically necessary for a particular child, the state is responsible for making a decision, for the individual child, based on the evidence." EPSDT Guide at 24. Consistent with the federal government's guidance, the Department offers an administrative appeal process where an administrative law judge decides if the Department's decision is correct. *See* [Dkt. 312-5 at 46-47]; 42 C.F.R. 431.220(a) (stating the "State Agency must grant an opportunity for a hearing").

## B.    Alliant did not wean people off of GAPP.

Appellees' original class claim was Alliant allegedly "improperly assumes that the primary caregivers can be taught all skilled nursing needs in order to wean class members off the program." [Dkt. 80 at 5]. The Department moved for summary

judgment on that claim. [Dkt. 312-1 at 18-20]. The Department does not wean consumers off of GAPP. There is no evidence showing the Department reduced hours in order to remove people from the program. As there is no cited evidence to support Appellees' position, their position should fail. *See* [Dkt. 312-4 at 7; 312-8 at 7; 312-9 at 8].

The trial court later changed the second claim to the "assumption that the primary caregivers can be taught skilled nursing needs and class members then can be weaned to lower hours than medically necessary or off the program." [Dkt. 386 at 3]. Based on that claim, the trial court found "significant reductions were due to the policy and practice of the GAPP program to wean nursing care if a child has been medically stable." [*Id.* at 16].

In so holding, the trial court ignored that medical necessity will change over time as situations change. For example, there is nothing strange about stable children receiving less skilled nursing hours. As this Court held, the Department "may permissibly conclude that persons whose conditions are worsening or who require frequent hospitalizations have a higher degree of medical necessity than those who are chronically stable." *Moore*,

637 F.3d at 1258. If a child's condition improved, they will typically need less nursing care.[18]

Likewise, if caregivers are trained to better care for their child, teaching hours are no longer medically necessary. There is plenty of testimony that when one joins the GAPP program, GAPP provides teaching hours. Such hours are medically necessary.

As previously discussed in this Court, Dr. Rosenfield testified "nursing hours are reduced 'based upon the competency, [and] knowledge of the parents.'" *Moore*, 637 F.3d at 1226-27 (emphasis added). Then in this case, GAPP is "designed to assist [caregivers] on learning the care of [the caregiver's] child's medical condition" and every request for hours has an allocation for teaching. [Dkt. 63-2 at 82; 71-1 at 5-6]. It is standard procedure for NICUs to teach parents how to care for their child prior to discharge and it would be unsafe to discharge without such training. [Dkt. 344-7 at 3-4].

---

[18] The trial court appears to rely upon an unpublished decision from the Eastern District of Texas for the proposition that Texas could not ask caregivers to provide medically necessary services. [Dkt. 386 at 17 (citing *Alberto N. v. Hawkins*, 2007 U.S. Dist. LEXIS 103201 (E.D. Tex. June 8, 2007))]. Of course, that is not the issue here. The Department is not asking caregivers to provide nursing. It allows for the reduction of skilled nursing hours when the caregivers no longer require teaching hours or the individual is stable.

The trial court's ruling implies that teaching hours can never be removed. But that is inconsistent with prior precedence holding that hours may be reduced if the participant was stable. *Moore*, 637 F.3d at 1258. It would also defy logic. Why require continued teaching hours when the caregiver no longer needs teaching?

In short, the Department does not deny medically necessary skilled nursing hours. But it does adjust nursing hours as the situation—and therefore medical necessity—changes. That is as it should be. The trial court's ruling to the contrary should be reversed.

### C.    The Department need not consider whether additional nursing hours would be convenient for caregivers.

GAPP allocates hours based upon medical necessity of the individual members. Below, Appellees argued the Department must "consider the capacity of the class members' primary caregivers when determining how many nursing hours are appropriate," the trial court found the issue moot. [Dkt. 80 at 5; 386 at 18]. The trial court then explained why it would rule in favor of Appellees on the issue. [Dkt. 386 at 17-18].

The trial court's reasoning was contradictory. First, it held the determination of medically necessary skilled nursing hours

51

"should be based on whether a service is medically necessary to correct or ameliorate a beneficiary's condition, not on whether or not the caregiver is able to provide those skills." [*Id.* at 17]. Then in the very next paragraph, it held that if Alliant can reduce hours, "it could only be accurately and fairly executed by considering what amount of skilled nursing assistance can reasonably be expected to be provided by the caregiver." [Dkt. 386-17-18].

The Department agrees with the first holding—medically necessary skilled nursing hours are for beneficiaries. The Department is required to provide "[s]uch other necessary health care...to correct or ameliorate defects and...conditions discovered by the screening services." 42 U.S.C. § 1396d(r)(5). As explained in *Moore*, the Department "is required to provide private duty nursing services to Moore, who meets the EPSDT eligibility requirements, when such services are medically necessary." *Moore*, 637 F.3d at 1255.

While it may be desirable to consider caregiver's schedule, such as whether other children are in the house or work schedules, it is not legally required. The "EPSDT mandate requires [the Department] to provide children, who meet the eligibility requirements, with medically necessary 'private duty

nursing services' to 'correct or ameliorate' their conditions." *Id.* at 1238. 42 U.S.C. § 1396(a)(4)(B) states EPSDT services are "for individuals who are eligible under the plan and are under the age of 21." 42 C.F.R. § 440.80 states, "[p]rivate duty nursing services means nursing services for <u>beneficiaries</u>." (emphasis added). EPSDT services are for individuals eligible for the plan.

It does not require the approval of nursing services for the convenience of caregivers.[19] While there could be a factual dispute about how many hours are convenient, there is no dispute that under the Medicaid Act, Alliant has no legal requirement to approve additional hours for the convenience of the caregiver. Without any legal basis, Appellees' claim should fail.

### D.  There is an administrative process for skilled nursing disputes.

As illustrated by this case, Appellees seek to make federal courts act as administrative law judges ("ALJ") rather than utilize the process provided in the Medicaid Act. It directs each State to provide "an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied." 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.205,

---

[19] Alliant will sometimes allocate hours when a parent is injured or for social circumstances. [Dkt. 312-14 at 14-15; 312-22 at 5-6].

431.220(a). The Department consistently asserted there is a separate process, which allows for administrative review of Alliant's decision without forcing the trial court to utilize its scarce judicial resources on an emergency basis. *See. e.g.* [Dkt. 7-1 at 5-6; 209 at 8, 16-17; 210 at 8-9; 227-1 at 6].[20]

In particular, Section 49-4-153(e)(2) of Georgia Code provides Office of State Administrative Hearings ("OSAH") shall assign an ALJ within 15 days of request. The hearing should occur within 90 days. [Dkt. 407-5]. Then the ALJ is to issue a decision within 30 days. *See id.*

Simply by administratively appealing, there would be no emergency and any decision would have to be issued within 30 days of the hearing record closing. *See* OSAH Rule 616-1-2-.27. There is no need for a federal court to expend its scarce judicial resources in an emergency manner to address an administrative proceeding.

Likewise, the trial court's holding that the treating physician's request is dispositive, vitiates the Medicaid Act's requirement for an utilization review program. *See* 42 U.S.C. § 1396a(30); 42 C.F.R. § 456.1; [Dkt. 344 at 2,8; 390 at 6 n.4; 401 at

---

[20] Strangely, the trial court ruled below that the Department never raised this issue. [Dkt. 433 at 10].

7 n.2; 402 at 7 n.3; 408 at 7 n.2; 421 at 6 n.7]. 42 C.F.R. §
456.1(b)(7) requires the State Plan establish "a plan for review, by
professional health personnel, of the appropriateness and quality
of Medicaid services." 42 C.F.R. § 456.2(b)(2) provides the
requirement may be satisfied by contracting with an independent
entity to conduct the reviews. A State is to establish and use
written criteria to evaluate the appropriateness of Medicaid
services. 42 C.F.R. § 456.5. 42 C.F.R. § 456.3 requires the State to
safeguard against unnecessary or inappropriate Medicaid
services. Likewise,

> A state may adopt a definition of medical necessity that
> places limits on a physician's discretion...and limit
> required Medicaid services based upon its judgment of
> degree of medical necessity so long as such limitations do
> not discriminate on the basis of the kind of medical
> condition...Furthermore, "a state may establish
> standards for individual physicians to use in determining
> what services are appropriate in a particular case" and a
> treating physician is "required to operate within such
> reasonable limitations as the state may impose."...

*Moore*, 637 F.3d at 1255 (citations omitted). If GAPP members can
simply file a federal lawsuit and receive an injunction ordering the
Department to do whatever their physician says, this entire
review program is superfluous.

55

## IV. Permanent Injunctions must fall.

### A.    Permanent Injunction relies on erroneous summary judgment and class certification.

This Court should reverse the permanent injunctions. As previously discussed, the trial court erroneously granted class certification, so only the named plaintiffs are eligible for injunctive relief. Likewise, the trial court erroneously granted summary judgment. Thus, the trial court cannot rely upon the class certification or summary judgment to grant permanent injunctive relief.

Moreover, Appellees failed to satisfy their burden for permanent injunctive relief as the trial court utilized the incorrect standard. The trial court granted the permanent injunctions because the Department "ha[d] not offered any grounds to reconsider" the preliminary injunctions. [Dkt. 433 at 10]. Yet, the burden is on Appellees to show the need for a permanent injunction. *Alabama v. United States Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005).

A preliminary injunction does not prove a permanent injunction. The "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits…it is generally inappropriate for a federal court at the

preliminary-injunction stage to give a final judgment on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted); *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 794 (11th Cir. 2020) (holding the "reliance on its factual findings at the preliminary injunction stage was improper at the summary judgment posture because 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'").

Notwithstanding the trial court's ruling that the Department "offered no evidence supportive of a different determination" of skilled nursing hours, the Department is the only entity which offered expert evidence against the granting of permanent injunctive relief. [Dkt. 433 at 9-10]. Dr. Papciak conducted physical exams of Appellees MH, EC and CC to determine the appropriate number of skilled nursing hours. [Dkt. 312-4; 312-8; 312-9].

Appellees offered no expert testimony to rebut his findings. They did offer lay witness testimony. "While lay witnesses may testify about their own immediate perceptions, testimony that blurs into supposition and extrapolation crosses the line into expertise." *Lebron v. Sec'y of the Fla. Dep't of Children & Families*, 772 F.3d 1352, 1372 (11th Cir. 2014). Accordingly, Dr.

Papciak's report is the only expert evidence about the number of skilled nursing hours.

The trial court based its ruling on class certification and summary judgment. It utilized the wrong standard and neglected to consider the Department's expert testimony. The permanent injunctions should be reversed.

### B.    Trial court improperly granted individualized permanent injunctions to class members.

Finally, the granting of individualized permanent injunctions shows the folly of class certification. Federal Rule of Civil Procedure 23(b)(2) requires that injunctive relief be "appropriate respecting the class as a whole."

Yet, the trial court began by stating the permanent injunction order addresses each "Class Member separately given the distinct nature of the injunctive relief requested." [Dkt. 433 at 4]. "The injunctive relief being granted is limited to the eight Movants and does not extend to the entire Class." [*Id.* at 11]. Without class certification, 5 of the 8 movants have no legal basis for permanent injunctive relief. The remaining movants have individualized claims.

# CONCLUSION

For the reasons set out above, this Court should reverse the judgment of the trial court.

Respectfully submitted.

/s/ *Jason S. Naunas*

Jason S. Naunas
   *Senior Assistant Attorney General*
Michelle W. LeGrande
   *Senior Assistant Attorney General*
Mark J. Cicero
   *Senior Assistant Attorney General*

Christopher M. Carr
   *Attorney General*
Bryan K. Webb
   *Deputy Attorney General*
Shalen S. Nelson
   *Senior Assistant Attorney General*
Office of the Georgia Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3416
jnaunas@law.ga.gov

Counsel for Appellant

59

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,999 words as counted by the word-processing system used to prepare the document.

_/s/ Jason S. Naunas_
Jason Naunas

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2022, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Jason S. Naunas*
Jason S. Naunas